[Civ. No. 2965.  Third  Appellate  District.—October  16,  1925.]

# J. L. BECKLEY, Respondent, v. J. B. ARCHER et al., Appellants.

[1] SALES—SALE OF DAIRY COWS—PROMISSORY NOTES — PLEADING—
CROSS-COMPLAINT—DECEIT — FRAUDULENT REPRESENTATIONS — EVI-
DENCE.—Where, in an action upon a promissory note given in part
payment of the purchase price of certain cattle by plaintiff's
assignor, the defendants, by their answer, admit the due execution
of the note sued on, but set up as in avoidance of the obligation
thereof a special defense founded upon fraud, alleging that they
were induced to purchase the cattle, consisting of certain dairy
cows, upon the false representations by plaintiff's assignor that
the cows were in a perfectly healthy condition and in every way
adapted to the purpose of dairy cows, and filed a cross-complaint
for damages alleged to have been suffered by them by reason of
the alleged fraud, to which cross-complaint the plaintiff interposed
an answer, denying the allegations charging fraudulent representa-
tions by his assignor as to the character and condition of the
cows, the cause of action set out in the cross-complaint was
founded on fraud and deceit under section 1572, subdivisions 1
and 2, of the Civil Code, and it was not only necessary, to sup-
port the cause of action so stated, for the defendants to prove that
the representations alleged were made and were false, but further
that in purchasing the cows, they solely relied upon and were like-
wise induced by the representations so made or some vital one of
such representations.

[2] ID.—FALSITY OF REPRESENTATIONS—INDUCEMENT.—In such action,
even if it had been shown to be true that the cows, after their pur-
chase by defendants, were found to be physically unfit for use for
dairy cows for any of the reasons alleged in the cross-complaint, a
failure to make a case under said pleading would follow unless
it were also shown that the representations alleged, or some of
them, were made, that they were false and that defendants were
led to make the purchase solely by reason thereof.

[3] ID.—CONDITION OF COWS—REPRESENTATIONS OF VENDOR—INSPEC-
TION BY PURCHASERS. — In such action, the defendants are in no
position to complain that some of the teats of the cows were so
shriveled or atrophied as to render the cows thus afflicted unprofit-

---

1. See 12 Cal. Jur. 818.
2. See 12 Cal Jur. 743, 750.
3. See 12 Cal. Jur. 756.

able as milch cows, since, as a matter of common knowledge, it is
known that it requires no veterinarian to discover such a defect
in the udders of milch cows and an inspection of the cows by any
person of common intelligence, and particularly by a person en-
gaged, as have been the defendants in the dairy business for a
long period of years, would readily reveal to him such condition
in milch cows, and where the defendants had convenient oppor-
tunity for inspecting the cows with a view of ascertaining the con-
dition of their udders; and, even if plaintiff's assignor did state
that the udders of all the cows were in a healthy or perfectly
normal condition, it was upon a matter which the defendants
could as well have informed themselves, they having full oppor-
tunity to do so. Under these circumstances it was their duty,
rather than to rely upon what plaintiff's assignor stated in regard
to the udders, to make an examination for themselves and then
exercise their own judgment in the matter.

[4] ID.—PERSONAL INVESTIGATION BY PURCHASER — PRESUMPTIONS.—
If, in a contract of sale, representations are made by the vendor
concerning some incident, qualities, or attributes of the subject
matter which are open and visible, so that the falsity of the state-
ments is patent to an ordinary observer, and it is made to appear
that the purchaser, at or shortly before concluding the contract,
had seen the thing itself which constitutes the subject matter, then
a knowledge of the facts is chargeable upon such party; he is
presumed to have made the agreement knowingly, and cannot allege
that he was misled by the false representations.

[5] ID.—OPINION OF VENDOR—EVIDENCE.—In an action upon a promis-
sory note given in part payment of the purchase price of certain
dairy cows, the testimony of plaintiff's assignor to the effect that
all of the cows were with calves "and would calve within six
weeks" amounted to nothing more than a mere opinion, and
whether this opinion was based upon his own inspection of the
cows, or upon the opinion of the veterinarian as the result of the
latter's examination of the animals, while not clear from the evi-
dence, is not important, where there was nothing in his testimony
or that of the defendants which shows or which reasonably may be
said to tend to show, that his opinion was expressed with a design
to deceive defendants as to the matter, and the defendants by the
exercise of their own judgment upon an inspection of the cows
could as well have satisfied themselves with regard to whether the
cows or those which had not already calved, were or were not
within six weeks, or approximately six weeks, of parturition.

4.   See 12 Cal. Jur. 760; 25 Cal. Jur. 964.

5.   See 12 Cal. Jur. 726.

[6] ID.—REPRESENTATIONS OF VENDOR—EVIDENCE—QUESTION FOR JURY. In such action, there being a conflict in the evidence as to the alleged representation of plaintiff's assignor as to whether the cows were afflicted with the disease of abortion, it was for the jury to resolve the conflict.

[7] ID. — FALSE REPRESENTATIONS—FRAUD—INDUCEMENT.—To constitute fraud, false representations must actually have had the effect of deceiving and thus leading the party to whom they are made into entering into an agreement by the terms of which he parts with something of value.

[8] ID.—INDEPENDENT INVESTIGATION—ESTOPPEL.—Where the vendee, in a contract of sale of property, does not believe or disregards the representations of the vendor as to the character, condition or quality of such property, but as to those matters prosecutes an independent investigation for himself, and, in purchasing the property, relies entirely upon his own inquiries and investigation, rather than upon the representations made by the vendor, the vendee, after discovering that the property is not of the character or quality or in the condition which his own judgment, based upon his own investigation, established it to be, cannot predicate a rescission of the contract or maintain an action for damages upon the representations so made by the vendor, even though they be shown to be false.

[9] ID.—FALSE REPRESENTATIONS OF VENDOR—RELIANCE BY PURCHASER ON OWN INVESTIGATION — DECEIT—DAMAGES—ESTOPPEL.—Even if the buyer wholly disbelieved and disregarded the representations made by the vendor as to the character or quality or condition of the property, and did not rely or act upon, or was in no measure induced by said representations to purchase such property, the vendee cannot claim to have been deceived or defrauded in making such purchase, even though it was true that he did ineffectually prosecute an independent investigation as to the condition, quality, or attributes of the property involved, and this is so because the essence or gravamen of a cause of action based upon section 1572 of the Civil Code is in the deceit practiced by the defendant upon the plaintiff and which produced the damage complained of.

[10] ID.—ACTION FOR DECEIT — FALSE REPRESENTATIONS HAVING NO EFFECT ON PARTY SOUGHT TO BE DECEIVED — DAMAGES. — In an action for deceit based upon section 1572 of the Civil Code there can be no damage where there has been no deception, or, what in

---

7.  See 12 Cal. Jur. 751; 12 R. C. L. 352.

8.  See 12 Cal. Jur. 760; 12 R. C. L. 357.

9.  See 12 Cal. Jur. 760.

10.  See 12 Cal. Jur. 750; 12 R. C. L. 355.

law is the same thing, where the alleged deception is in false representations which had no effect upon the mind of the party sought to be deceived in changing his position regarding the property as to which the false representations were made.

---

(1) 27 **C. J.**, p. 47, n. 84, p. 48, n. 91.  (2) 26 **C. J.**, p. 1137, n. 78; 27 **C. J.**, p. 49, n. 8.  (3) 26 **C. J.**, p. 1143, n. 20, p. 1151, n. 80.  (4) 26 **C. J.**, p. 1085, n. 20, p. 1150, n. 79, p. 1151, n. 82. (5) 26 **C. J.**, p. 1080, n. 87, p. 1081, n. 88.  (6) 26 **C. J.**, p. 1083, n. 12; 27 **C. J.**, p. 73, n. 62.  (7) 26 **C. J.**, p. 1167, n. 62, p. 1171, n. 94.  (8) 26 **C. J.**, p. 1162, n. 8, 9.  (9) 26 **C. J.**, p. 1162, n. 10. (10) 4 **C. J.**, p. 1029, n. 30; 26 **C. J.**, p. 1064, n. 57, p. 1083, n. 12, p. 1141, n. 94, 95, p. 1163, n. 13; 38 **Cyc.**, p. 1607, n. 72, 75, p. 1784, n. 85, 86.

APPEAL from a judgment of the Superior Court of Yolo County. W. A. Anderson, Judge. Affirmed.

The facts are stated in the opinion of the court.

Arthur C. Huston, Hudson Grant and A. G. Bailey for Appellants.

Forrest A. Plant for Respondent.

HART, J.—The plaintiff brought this action to recover on a promissory note in the sum of $3,000 executed by the defendants in favor of one H. H. Schmitt as in part payment of the purchase price of a certain number of head of cattle. Said note was by said Schmitt, before the filing of the complaint herein, assigned to the plaintiff. It was stipulated at the trial "that the note was duly made and executed by appellants and delivered to said Schmitt; that no part of the principal or interest had been paid, but that a credit of $175.00 should be allowed upon the note principal as of the date of its execution; that, in the transaction from which said note arose, said Schmitt was the agent of the respondent herein, and the note was delivered to him (Schmitt) as the agent of the respondent."

The defendants, by their answer, admit the due execution of the note sued on, but set up as in avoidance of the obligations thereof a special defense founded upon fraud, alleging that they were induced to purchase the cattle, which consisted of forty-nine head of "dairy cows," upon the false

representation by the said Schmitt that the said cows were in a perfectly healthy condition and in every way adapted to the purposes of dairy cows. Defendants also filed a cross-complaint for damages in the sum of $10,390 alleged to have been by them suffered by reason of said alleged fraud. To the cross-complaint the plaintiff interposed an answer, denying the allegations charging fraudulent representations by Schmitt as to the character and condition of the cows.

Upon the issues made by the cross-complaint and the answer thereto the cause was tried by a jury, with verdict for the plaintiff. Judgment was entered accordingly. A motion by defendants for a new trial having been disallowed, the defendants have brought the case here upon an appeal from the judgment.

The points pressed upon us for a reversal are that the verdict is without enough support and that certain instructions embraced within the trial court's charge to the jury involve misstatements of the law and, consequently, seriously militated against the rights of the defendants in the trial of the action.

The defendants, at the time of the transaction eventuating in the purchase by them of the dairy cows above referred to, were, on or about January 8, 1922, and for a long period of time prior thereto, engaged in conducting a dairy business in Yolo County. On the date just mentioned, they entered into an agreement with one H. H. Schmitt whereby they purchased and said Schmitt sold to them the said forty-nine head of cows, at the agreed price of $110 per head. These cows, as the cross-complaint alleges, and the undisputed evidence shows, were purchased by the defendants for use as dairy cows.

It appears from the evidence that Schmitt, acting for the plaintiff in the matter, procured the cows from a man named Adams, who had a short time previously shipped the animals with other cows from the state of Texas and placed them on his ranch near Lathrop, San Joaquin County. While the matter of the sale of the cows by Adams to Schmitt was pending and before the trade was completed, the latter had sixty-one head of the cows segregated from a band of eighty-eight belonging to Adams and had them driven into a field in which they were kept by

themselves to the end that they might the better be inspected and subjected to an examination which would determine their condition as to physical soundness and their suitableness for dairy use. Thereafter Schmitt had the cows inspected and examined by a veterinary, Dr. Lichtenwalter, and an experienced dairyman by the name of Bracken. The examination by the veterinarian was confined principally to the tuberculin test, conducted by the method usual in such cases. Upon this examination, and the opinion of the veterinary and Bracken that fifty head of said cows were in a healthy condition, being free from tubercular symptoms or other diseases to which cattle are peculiarly subject, Schmitt took the cows at the rate of $100 per head, exchanging mules therefor at the rate of $85 per head. Immediately after the consummation of this bargain, Schmitt drove the cattle to the ranch of Bracken, above spoken of, also situated a short distance from the town of Lathrop. All these transactions took place early or in the middle of the month of December, 1921. About fifteen or eighteen days after he had procured the cows, Schmitt, having learned that the defendants desired to purchase some dairy cows, entered into negotiations with the latter for the sale to them of said cows. After some discussion of the proposition between the parties, the defendants, accompanied by one Lewis Sheridan, went to the Bracken ranch to look at or inspect the cattle, with the result that they bought forty-nine head of the cows at the rate of $110 a head, they having themselves selected them from the herd procured by Schmitt from Adams.

At the trial, and in support of their defense and the charge set up in their cross-complaint that Schmitt falsely and with intent to defraud them represented the cows to be in a perfectly healthy physical condition and adapted to dairy purposes, the defendants testified that, while they were looking the cattle over before a sale thereof to them was perfected, they asked Schmitt particularly as to whether the cows were afflicted with a disease known as "abortion"—a condition, as we understand it, in female cattle which becomes of a chronic character and which, when existent in such cattle, arrests gestation and so causes the premature delivery of calves, with the almost invariable result that

the calves are either dead when delivered or die within a short time thereafter, thereby deteriorating the milk-producing quality of the cows; that they also asked Schmitt whether the cows were udder deficient, whether they were with calves, and, in short, whether they were in all respects perfectly fit for dairy use; that Schmitt replied in the most positive terms that the cattle were not suffering from the disease known as "abortion," and were wholly free from tuberculosis; that he had had the cows thoroughly examined by Dr. Lichtenwalter and that the doctor had pronounced them in a perfect condition of health, bearing none of the symptoms of any disease peculiar to cattle; that the cows would produce calves, and that some of them were already with calves. The defendants further testified that the cows proved entirely worthless for use as dairy cows; that only eight of the number were with calves when taken to their dairy ranch, but the calves came prematurely and all but two of the eight died within a few hours after their delivery; that some of the cows losing their calves would thereafter give a very small quantity of milk, while others likewise afflicted would give no milk at all; that they treated the cows so that, if capable of doing so at all, they would give milk, but that the treatment was wholly futile or ineffectual. In short, they stated that the entire herd or "bunch" of cows they purchased from Schmitt, save and except three or four, were wholly unfit for dairy purposes and were not worth, for beef cattle, to exceed $35 or $40; that, in fact, there were thirty-four head which they had been unable to sell at all for beef or any other purpose. The defendants testified that, while on the occasion mentioned they looked the cattle over before the purchase was made, and that (so one of them testified), the cows, from such inspection as they then subjected them to, appeared to be worth the price they paid for them, they, nevertheless, in making the purchase, relied entirely upon and were solely induced by the representations of Schmitt that the animals were in every respect in a sound physical condition and adapted to dairy purposes. One of the defendants further stated that, although he had heard and read of the fact that milch cows were often found to be afflicted with the disease known as "abortion," he was not an expert on cattle diseases and,

therefore, even a critical investigation by him of the cattle would not have enabled him to determine whether any of the cows were so afflicted.

Schmitt testified that, before completing the trade for the cows, he had the animals examined by Dr. Lichtenwalter particularly for the purpose of determining whether they were free from tuberculosis or tubercular germs. This examination took place on the Bracken ranch, sixty-one head of the cattle having been selected by Schmitt from a herd of eighty-eight cows and driven to said ranch, where there were barns equipped with stanchions and other facilities for conveniently conducting such an examination. The doctor, proceeded Schmitt, subjected the cows to a tuberculin test—that is, he injected into the cattle a serum commonly used for the purpose of making such a test; that, at the end of about ninety-six hours after the injection of the serum—the period of time necessary to intervene to determine the result of the test—he, with the doctor and Bracken, again inspected the cows and found that there were, among the herd of sixty-one, but two "reactors"—that is to say, that fifty-nine of the cows proved to be wholly without symptoms of tuberculosis, while two appeared to carry germs of the disease. Schmitt further testified that those cows—four or five—whose udders bore the appearance of not being normal were examined by the doctor and found to be in good condition. The reason, he said, that the udders of all the cows were not subjected to a physical examination was that it could easily be seen from a general survey of the animals not so examined that their udders were in a perfectly normal condition. Schmitt, who had for many years been engaged in the cattle business, also said that, at the time they were sold to the defendants, the cows, or a majority of them, were with calves; that there was no evidence of the disease of abortion in the cows and that some "six or eight" of the cows gave birth to calves before the animals were taken from the Bracken ranch by the defendants and that all said calves, with the exception of two, lived and were in a healthy state. Positively Schmitt testified that, during the negotiations resulting in the sale of the cows to the defendants, not a word was said, either by the latter or himself, about the disease of abortion, or as to whether

the cows or any of them were or were not afflicted therewith. Dr. Lichtenwalter corroborated Schmitt with respect to the examination he gave the cows, saying that his examination was conducted with the view of ascertaining whether any of the cows were afflicted with tuberculosis, that he found all but two of the sixty-one head selected by Schmitt to be entirely free from that disease or the symptoms thereof, that the udders of all the cows were in normal condition and that he observed in none of the herd any indications of the disease technically termed "abortion." Bracken, an experienced dairyman, who was present when the tuberculin test was made by the veterinarian, and who was also present when the sale of the cows was made to defendants, testified that the animals appeared on both occasions to be in a healthy condition; that the udders of none' were in any way deficient; that he did not, at the time the defendants purchased the cows, hear anyone speak of the disease of abortion; that, so far as he knew, the disease of abortion was not brought up or referred to either by defendants or Schmitt or himself.

The foregoing embraces a statement in substance of the testimony presented by both sides.

[1] The issues presented to the jury, specifically stated, were these: Whether the representations as to the physical condition of the cows and their fitness for dairy use were made by Schmitt, and if so, were they false and made with the purpose and intent of deceiving and defrauding defendants, and were defendants, in purchasing the cows, solely influenced or induced to make the purchase by the representations so made. The cause of action set out in the cross-complaint was, therefore, founded on fraud and deceit (sec. 1572, subds. 1 and 2, Civ. Code), and it was not only necessary, to support the cause of action so stated, for the defendants to prove that the representations alleged were made and were false, but further that, in purchasing the cows, they solely relied upon and were likewise induced to do so by the representations so made or some vital one of such representations. [2] And, even if it had been shown to be true that the cows, after their purchase by defendants, were found to be physically unfit for use for dairy cows for any of the reasons alleged in the cross-

complaint, a failure to make a case under said pleading would follow unless it were also shown that the representations alleged, or some of them, were made, that they were false and that defendants were led to make the purchase solely by reason thereof.

[3] Now, as to the evidentiary phase of the case, it will readily be seen that upon the issue of fraud, as alleged in the complaint, there is a substantial conflict in the evidence. Certainly there exists, or appears to exist, such a conflict upon the question whether Schmitt did or did not represent to the defendants that the cows were free from the disease known as abortion. As to the alleged assurance by Schmitt that the udders of all the cows were in a healthy or normal condition and that in that respect the cows were fit for dairy purposes, it is clear that if defect really existed it is one so patent and obvious that it would readily have been detected upon a visual examination of the cattle. The specific complaint in that particular is based upon the claim that some of the teats attached to the udders of several of the cows were, as we understand the testimony on that subject, so shriveled or atrophied as to render the cows thus afflicted unprofitable as milch cows—that is to say, that those cows were by reason of their defective udders incapable of producing the quantity of milk usual with first-class dairy cows. As a matter of common knowledge, it is known that it requires no veterinarian to discover such a defect in the udders of milch cows. An inspection of the cows by any person of common intelligence, and particularly by a person engaged, as have been the defendants, in the dairy business for a long period of years, would readily reveal to him such condition in a milch cow. The udder of a milch cow would, quite naturally, be among the first of the physical characteristics of such an animal which a person intending to purchase it for dairy purposes would give careful attention to or such an examination as would enable him at once to determine whether the animal was deficient in that particular as a milk producer. The defendants, according to their own testimony, saw several of the cows in a stall and were "amongst and about" the remainder of the herd as they were grazing in a field and Schmitt testified that a person could step up to and put

his hand on any of the cows while they were grazing, meaning, of course, that they were perfectly gentle and that a thorough inspection of them at "close range" could be had. Thus it is clear that the defendants had convenient opportunity for inspecting the cows with a view of ascertaining the condition of their udders, and, even if Schmitt did make the statement that the udders of all the cows were in a healthy or perfectly normal condition, it was regarding a matter upon which the defendants could as well have informed themselves, they having full opportunity to do so. Indeed, under the circumstances, it was their duty, rather than to rely upon what Schmitt stated in regard to the udders, to make an examination for themselves and then exercise their own judgment in the matter. (*Lee* v. *McClelland*, 120 Cal. 147 [52 Pac. 300].) [4] "If, in a contract of sale . . . ," says Professor Pomeroy, in his treatise on Equity Jurisprudence, third edition, section 894, "representations are made by the vendor concerning some incidents, qualities, or attributes of the subject matter which are open and visible, so that the falsity of the statement is patent to any ordinary observer, and it is made to appear that the purchaser, at or shortly before concluding the contract, had seen the thing itself which constitutes the subject matter, then a knowledge of the facts is chargeable upon such party; he is assumed to have made the agreement knowingly, and cannot allege that he was misled by the false representations." (See, also, *Hackleman* v. *Lyman,* 50 Cal. App. 323, 327 [195 Pac. 263].)

The above rule, it seems to us, plainly fits the facts of this case, in so far as are concerned the alleged defective udders. [5] The alleged representation by Schmitt that all the cows were with calves "and would calve within six weeks" is not entirely supported by the testimony of the defendants themselves. The defendant, Byron Archer, testified that there were several calves among the herd; that, when he asked Schmitt "why there were not more calves with this bunch," the latter replied that "a good many of them died from drinking rich Jersey milk." In his testimony, however, said Archer explained that the representation by Schmitt that "all the cows were with calves" was in reply to his (said Archer's) question as to

those cows which had · not at the time borne calves.
Schmitt testified that Dr. Lichtenwalter examined the cows
to see whether they were with calves before Schmitt pur-
chased from Adams and that both the doctor and himself
satisfied themselves that they "were picking calvey cows,
cows that were going to calve, and ones, of course, that
already had calves." This testimony shows that Schmitt's
statement to defendants as to the condition of the cows in
that particular amounted to nothing more than a mere
opinion. Whether this opinion was based upon his own
inspection of the cows or upon the opinion of the veterina-
rian as the result of the latter's examination of the ani-
mals, is not clear from the evidence, nor is it important,
for there is nothing in his testimony or that of the defend-
ants which shows or which may reasonably be said to tend
to show that his opinion was expressed with a design to de-
ceive the defendants as to the matter. To the contrary,
the fact that a large number of the cows had already de-
livered calves tends strongly to show that his expression
of the opinion that those cows which had not then already
been delivered were with calves, was honestly made and
with no intent or purpose to deceive the defendants. It
is elementary that expressions of opinion honestly made
are not actionable. (*Phelps* v. *Grady,* 168 Cal. 73, 77,
[141 Pac. 926], and cases therein cited.) But it is quite
manifest that defendants themselves by the exercise of
their own judgment upon an inspection of the cows could
as well have satisfied themselves with regard to whether
the cows, or those which had not already calved, were or
were not within six weeks, or approximately six weeks, of
parturition. With their long experience in the handling
of milch cows, it is hardly probable that, having themselves
inspected the cows, they relied on Schmitt's statement
rather than upon their own judgment regarding that mat-
ter, and the jury, it may be assumed, so viewed that phase
of the case.

[6] We have shown that both Schmitt and Bracken
testified that no question was asked by any of the defend-
ants as to whether the cows were afflicted with the disease
of abortion—that, in fact, that disease was never men-
tioned or referred to by any person present when defend-
ants were taking a view of the cows; that, therefore, there

was a conflict in the evidence as to the alleged representation by Schmitt with respect to that question which was for the jury to resolve; but it may further be remarked in that connection that the disease of abortion as applied to cows is not in all cases in a contagious form, as a statement in the brief of defendants implies. It is declared by very high authority (Special Report, 1923, on Diseases of Cattle, Bureau of Animal Industry of the U. S. Department of Agriculture, p. 165) that the said disease exists and manifests itself in two different forms, the one contagious and the other noncontagious, and it is important in this case to note that the same authority states that, except where the actual fact of abortion has occurred, the existence of the disease in either form can only be discovered by a microscopical examination of the cow, or by some other means of examination involving such a scientific test as will disclose the existence of such a condition. From this it is clear that Byron Archer, who stated that he had himself "read about" said disease, must have known, or at least, it must have occurred to him, that any representation by Schmitt, who was not a veterinarian, and who, as the evidence shows, made no pretense that an examination had been made, either by him or any veterinarian, with a view of ascertaining whether any of the cows were so afflicted, could have amounted to nothing further than the mere opinion of a layman having no more and perhaps less acquaintance with the diseases of cattle than had the defendant Byron Archer, or, for that matter, any other layman. The jury could apparently warrantably have so concluded, and probably did so conclude.

Concluding now on the branch of the case presently in hand, it may be suggested that if it were necessary to prosecute an inquiry to discover the particular considerations which led the jury to accept upon the issue of fraud the testimony presented by the plaintiff as against that presented by the defendants, one of singular significance is to be found in the fact that, although they notified Schmitt of the premature delivery of calves by some of the cows shortly after they took possession thereof, the defendants made no other movement looking to a rescission of the agreement of sale or the surrender and cancellation of the note in suit on the ground of failure of consideration

therefor (*Union Invest. Co.* v. *F. McLandon Co.*, 32 Cal. App. 305 [162 Pac. 903]), or for damages for any damage incurred by defendants for a breach of the agreement upon the part of the vendor in that the cattle sold were not what they were represented to be in quality or condition, but, to the contrary, continued (uncomplainingly, as far as the record shows) to retain possession of the cows (even making an effort to sell them), until the institution of this action some ten months after they had purchased the cows and seven or eight months after they had obtained what they conceived to be concrete evidence that some of them were afflicted with the disease known as abortion.

Having now sufficiently considered the point that the verdict is lacking in sufficient support from the evidence, we will proceed with the consideration of the contention that certain instructions allowed by the court do not correctly state the law of the case as made by the pleadings and proofs. There are two instructions thus assailed and they are the following:

"That false representations to constitute fraud must actually deceive. If it is not believed or if the party disregards it and makes inquiries for himself, there is no fraud, and that if you believe from the evidence in this case that the defendants did not believe the representations of plaintiff's agent and purchased the property in question after an independent investigation and inquiry and upon the strength thereof rather than upon the strength of said representations, then your judgment should be for plaintiff."

"*That statements by the vendor of property as to its adaptability to certain uses do not constitute fraud,* and you are instructed that if you believe that plaintiff's agent stated to defendants that the cows in question were good dairy cows, and if you find that at such time such statement was made, defendants knew that plaintiff's agent had no information as a basis for such statement, then such statement was not a misrepresentation in law."

The instruction first above presented embraces a correct abstract statement of the law. [7] It is unquestionably true that, to constitute fraud, false representations must actually have had the effect of deceiving and thus leading

the party to whom they are made into entering into an
agreement by the terms of which he parts with something
of value. [8] And no proposition could be less debat-
able than that where the vendee, in a contract of sale of
property, does not believe or disregards the representa-
tions of the vendor as to the character, condition or qual-
ity of such property, but as to those matters, prosecutes an
independent investigation for himself, and, in purchasing
the property, relies entirely upon his own inquiries and
investigation, rather than upon the representations made
by the vendor, the vendee, after discovering that the prop-
erty is not of the character or quality or in the condition
which his own judgment, based upon his own investigation
established it to be, cannot predicate a rescission of the
contract or maintain an action for damages upon the rep-
resentations so made by the vendor, even though they be
shown to be false. Counsel for appellants, however, argue
that the instruction is vulnerable because, as they contend,
it fails to embrace the statement that the inquiry inde-
pendently prosecuted by the vendee himself has been effec-
tive—that is, that thus he actually learned the real facts.
[9] It is true, of course, that if, by his own investigation
he has learned the *real facts* concerning the property, and
then makes the purchase relying solely on what he himself
has thus learned, he is bound by his own judgment in the
matter and cannot claim damages based upon deception
or false statements by the vendor regarding the quality or
condition of the property which in no manner or degree
operated to induce him to make the purchase. But the rule
even goes further, for if the buyer wholly disbelieved and
disregarded the representations made by the vendor as to
the character or quality or condition of the property, and
did not rely or act upon, or was in no measure induced
by said representations to purchase such property, then, in
such case, the vendee cannot claim to have been deceived
or defrauded in making such purchase, even though it was
true that he did ineffectually prosecute an independent in-
vestigation as to the condition, quality, or attributes of the
property involved. This is so because the essential essence
or gravamen of a cause of action based upon section 1572
of the Civil Code is in the deceit practiced by the defend-
ant upon the plaintiff and which produced the damage

complained of. [10] In a case of this character there can be no damage where there has been no deception, or, what in law is the same thing, where the alleged deception is in false representations which had no effect upon the mind of the party sought to be deceived in changing his position regarding the property as to which the false representations were made.

The criticism of the other or second instruction is directed particularly to that part thereof in italics, viz.: "That statements by the vendor of property as to its adaptability to certain uses do not constitute fraud." That part of the instruction, taken alone, while misleading in a case such as we have here, is, as an abstract statement, not far afield in the statement of a correct proposition, since it is manifestly true that the mere statement by the vendor of property as to its adaptability to certain uses would not constitute fraud, unless such statement was false and made with the intent and design to defraud a party out of his property or to induce him, to his detriment, to enter into an improvident contract. What the court probably intended to say was (and this is reasonably to be gathered from the succeeding language of the instruction) that the statement by the vendor of property as to its adaptability to certain uses does not constitute fraud if it appear that defendants knew at the time such statement was made that plaintiff's agent had no information as a basis for such statement. As so viewed, the instruction does not misstate the rule. It is to be conceded, though, that the instruction is not wholly free from criticism and that, if it stood alone upon the subject to which it relates, it might be troublesome in the consideration and disposition of this appeal; but elsewhere in its charge the court submitted to the jury, in two separate instructions, a correct statement of the rule applicable in this case. The rule so stated was embraced in the two following instructions, given by the court on the request of defendants:

"You are instructed, that if you find from the evidence that the cows showed and offered to the defendants were then and there stated by plaintiff or his agent, to be good dairy cows and suitable for dairy purposes, when in truth and in fact they were not dairy cows and were unsuitable for dairy purposes, and that this representation was made

to induce defendants to purchase said cows and was believed and relied upon by defendants, that one fact alone will entitle the defendants to damages, and the measure of damages will be as herein defined.''

The second given instruction, also proposed by the defendants, in effect, repeats the statement of the rule as follows:

''If you find from the evidence that the cows delivered were unsuitable for dairy purposes you will then find the amount of profits, if any, which the defendants have lost between the day of sale to the day of trial, by reason of their conducting their dairy business with the inferior cows so delivered to them by the plaintiff as aforesaid.''

We cannot persuade ourselves that the jury could have been misled as to the law of the case, as it is clearly declared in the two foregoing instructions, by the criticised instruction, particularly in view of the fact that the latter instruction is, as we have shown, capable of being so construed as to harmonize with the rule as it was stated in the instructions last above quoted herein. But, even if it be granted that the assailed instruction is or appears to be inconsistent with the instructions containing a correct statement of the rule, a careful and reasonable analysis of said instruction will force the conclusion that the repugnancy is so slight that the jury could not have been misled or confused as to the true rule by which it was their duty to be governed in solving the proposition which it was the evident design of the court thereby to submit to them. In applying the rule that a judgment will be reversed ''where two instructions are contradictory in essential particulars,'' it is also ''to be borne in mind,'' said Justice McLaughlin (when a member of this court), in *Hayden* v. *Consolidated Min. etc. Co.*, 3 Cal. App. 136, 139 [84 Pac. 422, 423], ''that, although some of the instructions may in slight respects be repugnant to each other, if it appear that the jury could not have been misled thereby, a new trial will not be granted,'' citing a number of cases. Again, in that case, the learned justice further said: ''And it must further be remembered that 'the meaning of the court below cannot be fairly arrived at by a partial view of what the jury was told was the law by which they should be governed. All that was said to them in rela-

tion to the matter should be considered.' (*People* v. *Kennedy,* 55 Cal. 202; *Ellis* v. *Tone,* 58 Cal. 297; *Monaghan* v. *Rolling Mill Co.,* 81 Cal. 193, [22 Pac. 590]; *Feliz* v. *Feliz,* 105 Cal. 6 [38 Pac. 521].)   In construing the charge of the court, it must be viewed by the light of common understanding, and the practical administration of justice should not be defeated by a too rigid adherence to close and technical analysis of the whole or any part thereof," citing many cases.

Our conclusion is, as the foregoing discussion indicates, that the judgment should be affirmed, and it is so ordered.

Plummer, J., and Finch, P. J., concurred.